In the ESTATE OF Pauline SHAW,
Deceased, Wesley F. Troutt,
Respondent,

v.

James and Donna McKOWN,
Appellants.

No. WD 66590.

Missouri Court of Appeals,
Western District.

April 10, 2007.

Motion for Rehearing and/or Transfer to
Supreme Court Denied May 29, 2007.

Kenneth C. Hensley, Raymore, for Appellants.

Dale A. Norris, Raymore, for Respondent.

Before LOWENSTEIN, P.J., SPINDEN and NEWTON, JJ.

HAROLD L. LOWENSTEIN, Judge.

James and Donna McKown ("the McKowns") appeal from the judgment of the Circuit Court of Clinton County, Probate Division, denying their motion under Section 473.803 [1] for repayment of expenditures they made for repairs on property devised to them under the will of decedent Pauline Shaw. The primary question is whether the Independent Personal Representative of the estate took possession of the real estate and was, therefore, obligated pursuant to Section 473.803 to pay for expenses incurred by the appellants for repairs and improvements to a house and other property where appellants actually lived and farmed.

## I. FACTS

### A. OVERVIEW

Mrs. Shaw owned 320 acres in Clinton County on which the McKowns ran a cattle operation. Mrs. Shaw lived in a house ("the main house") on one acre of the total tract (hereinafter the "Clinton property"). The McKowns leased the remaining 319 acres and lived in a second house ("the tenant house") on the property. The McKowns did not pay rent for the tenant house, but, rather, helped Mrs. Shaw keep her property mowed and ran errands for her. They were obligated to pay rent on the acreage they farmed.

Mrs. Shaw died in July 2003 and devised all 320 acres, the two houses, and various farm buildings to the McKowns. Under the will, the McKowns also received personal property worth $46,000, including the

1. All statutory references are to RSMo. (2000).

decedent's car, household goods, coins and jewelry, and lawn and garden equipment. The real property was valued somewhere between $925,000 and $1,000,000.[2] The remaining estate assets, including real estate in Holt County, as well as stocks and bonds inventoried at $1,400,000, were bequeathed to the Shriner's Hospital for Children and the St. Jude Children's Research Hospital.

Two days after Mrs. Shaw died, the independent personal representative of her estate, Wesley Troutt ("the Independent Personal Representative" or "IPR"), contacted the McKowns and informed them of the devise. He told them that the Clinton property "was theirs to do with as they saw fit," and they "could move in or remodel the [main] house." A potential claim arising from the Holt County real estate, and unrelated to the Clinton property, required that the estate remain open indefinitely. The Clinton property, or some part thereof, might have been required to defray the costs of estate administration, to pay for federal or state estate tax liabilities, or to pay possible estate obligations arising from the pending litigation in Holt County.

Although not required under the will or by law, the Independent Personal Representative agreed to maintain insurance and pay property and personal taxes and utilities on the Clinton property during probate of Mrs. Shaw's will. At the date of Mrs. Shaw's death, the McKowns were already in possession of the keys to the main house as well as the home and buildings they had been renting. At all times during the estate administration, the McKowns lived and operated their business on the property. The McKowns proceeded to repair and remodel the portions

of all property (as outlined in the attached time line).[3]

In September 2004, the IPR informed the McKowns by letter that the property was transferred to them from the estate of Pauline Shaw and that the estate would no longer pay the utilities, taxes, or insurance on the property. In January 2005, the McKowns made the present claims for reimbursement against the estate totaling $44,458 for repairs to the property. They also demanded the insurance proceeds arising from damage to the property after a storm in 2004. The McKowns received a deed to the property in February 2005.

## B. ITEMIZED CLAIMS

Shortly after the McKowns took possession of the Shaw residence, appellant Donna McKown approached the Independent Personal Representative to ask the estate to pay for repair of the Spanish tile roof on the main house. The roof had been leaking for years but the only damage was a small water stain on the ceiling of a room; the roof sheathing and rafters were not affected. The estate declined to pay for the roof work. Instead of approaching the probate court to ask for a determination whether the estate should be required to pay for repairs to the roof, the McKowns proceeded to replace the roof at a cost of $29,932.00. The McKowns did not consult the estate further. The replacement roof was expected to last another 65 years.

The McKowns contracted for bulldozer work to several earthen dams on ponds in the pastures on the property in September 2003. The McKowns did not approach the Independent Personal Representative about the repairs, did not ask that the estate to pay for the work, or advise the

---

2. The property abuts Smithville Lake.

3. Many of the exact dates and details are in question. Therefore, a timeline of events follows this opinion.

IPR after the work was completed. The ponds were on the acreage the McKowns had rented from Mrs. Shaw and had been in the hands of the McKowns for a number of years. The record does not indicate that the ponds were in danger of imminent failure at the time of the dam work. The McKowns claimed that the condition of the ponds made them unsuitable for cattle. The total cost of the dam work was $4,680.00.

The McKowns replaced a backflow prevention valve that had broken sometime during the winter of 2003. They argued that the repair was necessary as the house is connected to both a well and the rural water supply. The record is unclear whether the valve is the only repair in the line item for $400.00 denominated "Plumbing repairs." The McKowns also claimed $1,600.00 for "Repair to heating system."

In November 2004, two months after the IPR informed the McKowns that the estate would no longer pay the taxes, utilities, or insurance for the property, the McKowns obtained an estimate to have the property around the main house regraded. The work had not been done at the time of the trial but the McKowns argued that the regrading was reasonably required for preserving the estate property. The McKowns submitted an estimate for $4,935.00 for regrading and $1,411.00 for replacement of cabinets and floors damaged by water.

The McKowns also claimed insurance proceeds for damage done by a May 2004 storm. A section of fence and some farm buildings were damaged by the storm. The insurance adjuster estimated the cost of repairing a twenty-foot section of fence and two gates at $750. The total insurance proceeds of $2,155.36 included compensation for damage to the outbuildings and the tenant house. The McKowns submitted bills for: (1) replacing 224 feet of fence with a heavier gauge wire and three gates at a total cost of $1,618.00; and (2) repairing of cracks in the tenant home basement that were existing at the time of Mrs. Shaw's death at a cost of $1,500.[4]

In addition to the insurance proceeds, the McKowns' claims totaled $44,458. The claims include both completed work for which they had paid from personal funds and estimates for work they claim was required to preserve the Clinton property during estate administration.

## II. PROCEDURAL POSTURE

In January 2005, the McKowns filed a claim against the estate for payment of the insurance proceeds, as well as the cost of repairs pursuant to Sections 473.803 and 473.810. In addition to the insurance proceeds, the McKowns sought to be recompensed for $44,458.00 in repairs. After a bench trial, the probate court granted the McKowns' motion as to all the insurance proceeds but denied all other claims. The trial court stated that substantially all the problems addressed by the McKowns' repairs existed prior to Mrs. Shaw's death. The repairs improved the property beyond the condition existing at the time of her death. The judgment stated that the "proposed expenditures go beyond simply maintaining or preserving the estate assets as contemplated by § 483.803 RSMo," and, therefore, the claims were denied. The trial court did not address the other issue confronting the McKowns' motion: Did the IPR ever have possession of the property in question?

---

**4.** The record indicates that the basement was unfinished and no damage had resulted from the cracks.

## III. Discussion

In their single point on appeal, the McKowns argue that the court erred in denying the motion as the Independent Personal Representative was required to make the claimed repairs under Sections 473.803 and 473.810. The McKowns contend that under these provisions, the IPR was charged with maintaining and preserving the Clinton property. As the IPR failed to undertake the necessary repairs to the property, the McKowns were required to expend personal funds to maintain estate property. Therefore, they argue, they must be recompensed from the residuary estate funds for the cost of the repairs.

### A. Standard of Review

This court reviews a bench-tried case under the standard established by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). The judgment of the trial court will be affirmed if the judgment is not supported by substantial evidence, misstates, or misapplies the law. *Id.* Evidence is viewed in a light most favorable to the judgment and all permissible inferences are found in favor of the responding party. *Id.*

The central issue on appeal is whether the IPR was required to undertake the identified repairs to maintain and preserve the Clinton property. Mrs. Shaw's estate was independently administered by the personal representative of the estate. His authority and responsibility as to estate property were governed by Section 473.803, providing in part that:

> [E]very independent personal representative has a right to, and shall take possession or control of, the decedent's property, except that any real property or tangible personal property may be left with or surrendered to the person presumptively titled thereto unless or until, in the judgment of the independent personal representative, possession of the property by him will be necessary for purposes of administration. *The independent personal representative shall pay taxes on, and take all steps reasonably necessary for the management, protection, and preservation of, the estate in his possession.*

(Emphasis added to indicate the statutory language upon which the appellants rely in claiming the estate should bear the cost of the repairs the appellants made.)

■ The McKowns' argument centers around this provision's directive that the IPR "take all steps reasonably necessary for the ... *preservation of* ... the estate in his possession." (Emphasis added.) However, in order to hold the estate responsible under 473.803 for the cost of the repairs they undertook, the McKowns must show *both* that (1) the Independent Personal Representative was in *possession* of the property; *and* (2) the repairs were reasonably necessary to *preserve* the property.

### B. Possession of the Clinton Property

■ To be charged with a duty to preserve and maintain the Clinton property under Section 473.803, the property must be found to have been in the possession of the Independent Personal Representative. The McKowns contend that, although they had undisputed physical possession, the IPR retained "legal possession," or title, to the Clinton property. The McKowns argue that because they did not receive a deed until February 2005, they did not have legal possession of the property during estate administration. This lack of legal possession is evidenced by their alleged inability to insure the property or use the property to secure a bank loan. Moreover, they contend, the IPR took re-

sponsibility for paying the taxes, utilities, and insurance on the property, actions of one who possesses property. Thus, the McKowns aver, the Independent Personal Representative had possession until they received the deed in February 2005, or, at the very least, the IPR retained possession until September 2004 when he informed them that the property was "transferred" out of the Shaw estate.

Under Missouri law, a decedent's property, real and personal, devolves to the person to whom it is devised by the decedent's last will at the moment of death. Section 473.260. "Indeed, Missouri, is rather unremarkable in this regard, as the law of virtually every state specifies that equitable title in a decedent's estate vests immediately upon date of death in the beneficiaries, subject to the claims of creditors of the decedent and costs of administration." *In re Brajkovic*, 151 B.R. 402, 407 n9 (Bankr.W.D.Tex.1993).

 Upon death, both title and power of control of real property "goes directly to the heirs or devisees . . . and the executors have no concern with it." *In re Will of Jackson*, 291 S.W.2d 214, 223 (Mo.App. 1956). Missouri law is clear that a devisee possesses the real property immediately upon the testator's death. *See Hughes v. Wilson*, 733 S.W.2d 36, 38 (Mo.App.1987) ("When a person dies, his or her land by operation of law, descends to the heirs . . . ."); *In re Bartels' Estate*, 238 Mo. App. 715, 187 S.W.2d 348, 350 (1945) ("There is no disagreement about the general proposition that upon the death of a decedent, title to his real estate vests directly with his heirs or devisees . . . and that the . . . personal representative acquires no interest in the real estate of the decedent . . .") Under Section 473.260, a devisee holds the property *subject* to possession by the IPR if the personalty proves insufficient and the devised real

property is required to defray administration expenses, claims, or taxes. *Hughes*, 733 S.W.2d at 38.

In this case, the McKowns had physical possession of 319 acres of the Clinton property at the time of Mrs. Shaw's death. Under Missouri law, they also had title and control of the all property from the moment of death. They held the property subject to possession by the Independent Personal Representative to defray administration expenses. The question then becomes whether the IPR took possession of the real property from the McKowns after Mrs. Shaw's death.

 Under a supervised administration, the personal representative of an estate cannot obtain possession of real property in the hands of a devisee for estate administration purposes without a court order. Section 473.263; *In re Estate of Vester*, 4 S.W.3d 575, 578 (Mo.App.1999). Thus in a supervised administration, the question of possession of estate property is much more concrete. However, a personal representative of an independently administered estate, the independent personal representative, does not require a court order to take possession of the real property if the property is required for estate administration. *Vester*, 4 S.W.3d at 578. As Mrs. Shaw's estate was independently administered, the statutory language and the actions of the independent personal representative must be analyzed to determine when, or if, the independent personal representative had possession of estate property.

 Even though a court order is not required, the language of Section 473.263 does require that an independent personal representative *act* to take possession. At the moment of death title to real property devolves to the devisees. An independent personal representative must act affirma-

tively to take possession of the real property from the devisees. If the personal representative does not act to take possession or communicate that he is taking possession, then possession remains in the hands of the devisee.

Here, the acts of respondent IPR do not demonstrate any intent to take possession of any part of the Clinton property. Although the IPR offered to pay property taxes and utilities and maintain the insurance on the Clinton property, these actions were for the convenience of the McKowns, given that the estate was required to remain open indefinitely. The record does not reflect that the IPR ever acted to take physical possession of the property by requesting the keys to the main house or blocking the McKowns' access to any of the property. He never had a key to the main house nor a key to the tenant house. In fact, the IPR was required to coordinate with the McKowns to obtain access to the main house for the estate inventory.

In contrast, the McKowns' actions are more indicative of possession of the Clinton property than the actions of the IPR. The McKowns only inquired whether the estate would pay for repairs to the roof of the main house. Thereafter, the McKowns never consulted with the IPR about the repairs and improvements. Nor did the McKowns approach the probate court to demand that the IPR act. They now claim that their actions were necessary to avert the "potential for ruin" or the "potential for damage" to estate property. If the condition of the estate property was as dire as they now claim, at the very least they should have approached the IPR, if not the probate court. However, outside their inquiry about the roof, the McKowns never informed the IPR that the Clinton

property had so deteriorated that immediate repairs were required or that the property was in imminent peril. The McKowns proceeded to make the improvements without consulting any other party, just as would an owner treat his own property.

Moreover, the McKowns did not pay rent to the estate during the period of administration for the 319 acres upon which they ran their cattle operation.[5] When the IPR informed the McKowns of the devise, he told them that they were no longer obligated to pay rent. This action is consistent with McKowns' ownership, and possession, of the property. If the McKowns truly believed that the IPR "possessed" the property, their obligation for rental payments should have continued until September 2004 or even February 2005. The record indicates, however, that the McKowns did not make any rent payments after July 2003.

 The McKowns contend that their inability to insure the Clinton property or use the property to secure a bank loan is evidence of their lack of title. Rather, this inability is more likely the function of the risk associated with property subject to probate rather than a lack of possession. Indeed, "[a]lthough a beneficiary's interest may be of no economic value until the will is probated, an heir or devisee may nonetheless legally sell or convey this interest immediately upon death of the testator without waiting for probate." *Brajkovic,* 151 B.R. at 407 (*citing Trenton Motor Co. v. Watkins,* 291 S.W.2d 659, 663 (Mo.App. 1956)). Thus, the McKowns had the legal right to pledge, sell, or insure real property devised to them under the will if they could find a party willing to bear the risk of the transaction. The McKowns had

5. At the time of Mrs. Shaw's death, the McKowns had an arrearage of $5,000 for past rent as yet unpaid. The estate did not pursue collection of the money nor demand that the McKowns continue the rent payments.

physical possession of the Clinton property during the entire estate administration. Moreover, under Section 473.260, the McKowns were vested with title to the real property upon Mrs. Shaw's death. The IPR never acted to take possession of the property from the McKowns for the purpose of estate administration. As the IPR never took possession of the Clinton property, he cannot be charged under Section 473.803 with the preservation and maintenance of that property.

## C. Preservation of Estate Property

 Even if the McKowns could establish that the IPR had taken possession, or even constructive possession, of the real property, the record was replete with sufficient evidence from which the probate court could conclude that the repairs, and proposed repairs, were never necessary to preserve or protect the estate's assets.

The court's conclusion under these facts was correct: the McKowns' claimed purpose for the repairs did not rise to the level of preservation of estate property. Under these facts, the residuary beneficiaries, namely the Shriner's Hospital for Children and the St. Jude Children's Research Hospital, should not be required to bear the cost of repairs and improvements to the Clinton property. The repairs and improvements do not demonstrate any preservation purpose but rather were undertaken for the McKowns' own benefit and convenience. For such repairs and improvements, the estate is not responsible under Section 473.803.

The trial court did not err in denying the McKowns' claim for compensation. The judgment of the trial court is affirmed.

All concur.

### Timeline of Repairs and Improvements to the Shaw property

| | |
|---|---|
| July 13, 2003 | Pauline Shaw dies. |
| July 15, 2003 | IPR informs McKowns that Mrs. Shaw devised the Clinton property to them. |
| July - September 2003 | McKowns approach IPR about replacing the roof. The estate declines and the McKowns proceed to have the work done at their own expense. |
| September to October 2003 | ROOF REPAIR $29,932.00. DAM WORK ON PONDS $4,680.00 |
| May 2004 | Storm damage to Clinton property. Insurance estimate is $2,155.36 for damage to property buildings and 20′ of fence and two gates. Estate pays for uninsured fence damage. McKowns replaced 224′ of fence and three gates but limit their demands to the insurance proceeds of $2,155.36. |
| September 2004 | IPR informs McKowns by letter that the property is formally transferred to them from the estate of Pauline Shaw. |
| October 2004 | REPAIR TO CRACKS IN TENANT HOUSE FLOOR $1,500.00. |
| November 2004 | McKowns get estimates for grading work. REGRADING MAIN HOUSE $4,935.00 (estimate only) REPLACE CABINETS AND FLOOR $1,411.00 (unclear) |

The details of the following repairs and improvements are not made clear in the record. The dates the estimates were obtained or the work was done and the purpose for which the repairs were undertaken are not clearly identified in the record.

REPAIR HEATING SYSTEM $1,600.00
PLUMBING REPAIRS $400.00

| | |
|---|---|
| January 2005 | McKowns move for payment for the repairs and the insurance proceeds under §§ 473.803 and 473.810 RSMo. |
| February 2005 | McKowns receive the deed to the Clinton property. |
| January 2006 | Trial court grants McKowns' motion with respect to insurance proceeds but denies the motion with respect to the other repairs. This appeal by the McKowns follows. |